UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
New Albany Division

ALAINA TINGLE-DUNCIL

Plaintiff

v. Claim No.: 4:23-cv-167-TWP-KMB

JEFFERSON COUNTY SHERIFF'S DEPARTMENT, et al.

Defendants

**RESPONSE IN OPPOSITION TO DEFENDANT ADVANCED CORRECTIONAL HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT**

Now Comes Alaina Leatherbury, (formerly Alaina Tingle-Duncil, hereinafter "Mrs. Leatherbury"), through undersigned counsel and files this response to Defendant Advanced Correctional Healthcare's ("Defendant ACH") *Motion for Summary Judgment.* [Dkt. 77]

## I. ISSUE PRESENTED

There are two issues in this case, and Defendant ACH misstated both. Mrs. Leatherbury's initial claim has nothing to do with whether Defendant ACH and its employees followed a physician's recommendation to provide Cytotec. The first issue questions whether Defendant ACH and/or its employees' actions and/or inactions related to Mrs. Leatherbury's care violated her rights protected by 42 U.S.C. §1983. Specifically, did the actions and/or inactions of Defendant ACH and/or its employees result in Mrs. Leatherbury experiencing unnecessary pain and suffering due to their failure to provide adequate and timely medical care? The second asks whether Defendant ACH and/or its employees were negligent in the care they provided Mrs. Leatherbury.

## II. INTRODUCTION

Defendant ACH contracts with the Jefferson County Indiana Sheriff's Department to provide medical services in the Jefferson County Jail. Mrs. Leatherbury brought this action against Defendant ACH as a result of injuries she sustained due to their failure to provide timely and appropriate medical care while she was incarcerated in the Jefferson County Jail.

Mrs. Leatherbury was approximately nine (9) weeks pregnant when she was incarcerated on August 9, 2021. During a September 28, 2021, doctor's appointment Mrs. Leatherbury was told her baby appeared to have been dead for approximately three (3) weeks. On October 1, 2021, she was given medication by a member of Defendant ACH's staff intended to induce a miscarriage, and she was sent back to her cell block. Within 45 minutes of returning to her cell, Mrs. Leatherbury began experiencing excruciating abdominal pain, uncontrollably bleeding vaginally and passing large blood clots.

Mrs. Leatherbury remained in the block for five (5) days where the other inmates cared for her because members of Defendant ACH's medical staff would not. On October 5, 2021, she was transferred to a cell in the book-in area where she could be observed by Defendant ACH's medical staff who still failed to act on her medical emergency. Despite her clearly progressive and worsening hemorrhagic complications she was not taken to the hospital until October 6, 2021. Upon hospital admission Mrs. Leatherbury's hemoglobin level was a dangerous 6.4. She was diagnosed with an incomplete abortion, and she required two units of blood. Mrs. Leatherbury's critical condition and the pain and suffering she endured was directly the result of Defendant ACH and its medical staff.

## III. DISPUTED AND UNDISPUTED STATEMENT OF MATERIAL FACTS

Except for where noted below, it is not disputed that Defendant ACH's Statement of Material Facts not in Dispute taken from the Narrative Progress Notes (included in Dkt. 77-1, attached thereto as *Ex*. A), the Norton King's Daughters' Health records (Dkt. 77-2 and 77-3, attached thereto as *Ex*. B) and excerpts from Mrs. Leatherbury's deposition (Dkt. 77-4, attached thereto as *Ex*. C) reasonably reflects what is stated in those documents. That said, while being generally correct and supported by the referenced documents, several are incomplete, inaccurate, incorrect and/or the cited language was taken out of context.

On September 28, 2021, Mrs. Leatherbury saw obstetrician Dr. Kelli Hertz at her office at King's Daughter's Health; however, there is no notation that Mrs. Leatherbury was diagnosed with a miscarriage. Indeed, the referenced records indicate that she *was* "currently pregnant" on September 28, 2021. *Ex*. B, p. 28. Mrs. Leatherbury stated in her deposition that Dr. Hertz told her that the fetus was deceased and that she thought it had been dead for approximately three weeks, but that is not in the medical records referenced by Defendant ACH. *Ex*. B, p. 28.

The September 28, 2021, jail Narrative Progress Note does state that Dr. Hertz diagnosed Mrs. Leatherbury with a missed abortion and that she should pass the retained fetal sac on her own. However, Defendant ACH's statement of facts inaccurately characterizes the discussion Mrs. Leatherbury had with the nursing staff. From the note, it appears that Mrs. Leatherbury advised the staff that she had "not yet" begun bleeding or cramping. *Ex*. A, p.8.

The staff did advise Mrs. Leatherbury to notify them of any excessive bleeding, which they considered filling a pad in one hour. *Id*. Mrs. Leatherbury was tearful and asked not to be placed on Medical Watch because, "I don't want to be alone." It is disputed, because it is not in the note that "She wanted to remain in the general block with her friends." *Id.*

Nurse Keltch administered the medication to Mrs. Leatherbury on October 1, 2021, and she and Nurse Anna Stewart counseled her on what to expect regarding bleeding, cramping, and passing clots. *Ex*. A, p. 11. Within 45 minutes of returning to her cell, Mrs. Leatherbury began experiencing excruciating abdominal pain, uncontrollably bleeding vaginally and passing large blood clots. *Ex*. E. It was so severe that she bled through her clothes, the pads and adult diapers she was given, her bunk, and onto the floors of her cell, the dayroom and the bathroom. *Ex*. F. She became pale and weak, to the point that she could not eat. *Ex*. E. It is acknowledged that Nurse Keltch also gave Mrs. Leatherbury maxipads with wings and disposable underwear. However, it is disputed, and a basis for one of Mrs. Leatherbury's claims, that when the bleeding, cramping and passing of clots began, Defendant ACH's staff render timely and appropriate medical care. It is arguable that Defendant ACH's expert, Dr. Kathleen Lynn Bemenderfer, would agree with that conclusion because in her report she states that:

> By the time the patient saw an officer in the late evening/early morning of October 4, 2021, she had already lost a significant amount of blood. So even if the *jail* staff had sent her to the hospital at that time, or the following day on October 5, 2021, [Mrs. Leatherbury] would have required a blood transfusion in the hospital due to blood loss. Emphasis added.

Dkt. 77-5, p. 2.

According to Dr. Bemenderfer, Mrs. Leatherbury lost a significant amount of blood between October 1, 2021, when the medication was provided, and October 4, 2021, when the protocol was performed. *Id*. Mrs. Leatherbury remained in jail two more days before she was transported to the hospital on October 6, 2021. *Ex*. A, p. 18.

It is not disputed that one of the nurses purchased, with her own money, larger pads and Depends for Mrs. Leatherbury, stating the original ones would not help. Ex. D, p. 56, lines 17-20. It is disputed that Defendant ACH's staff adequately monitored Mrs. Leatherbury's condition.

Arguably if the nurse recognized the original pads would not help, she should have recognized the blood loss needed to be more closely monitored.

It is disputed that "the nursing staff" apologized to Mrs. Leatherbury for what she was going through when they gave her the medicine. According to Mrs. Leatherbury's, she only mentioned "Nurse Cami" being present. *Ex*. D, p. 59, lines 5-6. When Mrs. Leatherbury told Nurse Tonya that she was still bleeding very heavily, Nurse Tonya told her that's all part of the process, and you're just going to have to deal with it. *Ex*. D, p. 63, lines 2-6.

It is not disputed that on October 3, 2021, Mrs. Leatherbury submitted a medical grievance form stating she wanted to give her mother permission to get her medical records. *Ex*. A, p. 7.

It is not disputed that on October 4, 2021, the nursing staff reported Mrs. Leatherbury's progress to Dr. Hertz's office and were told to have follow-up in their office during the week of October 15, 2021. *Ex*. A, p. 13. It would be disputed if Defendant ACH attempted to argue that on October 4, 2021, its staff checked on Mrs. Leatherbury. The October 4th Narrative Progress Note does not reflect checking on her that day, as all other daily entries had done. *Ex*. A, p. 13.

It is undisputed that just before midnight on October 4, 2021, an officer took Mrs. Leatherbury's vital signs and noted that she reported excessive bleeding. *Ex*. A, pp. 14-16. It is disputed that Defendant ACH employee NP Washington acted appropriately by ordering jail staff to place Mrs. Leatherbury on a medical watch in the book-in area after being advised of excessive bleeding. *Id*.

It is disputed that Nurse Keltch saw Mrs. Leatherbury "first thing" the following morning on October 5, 2021. Knowing Mrs. Leatherbury's condition, according to the narrative progress note, Nurse Keltch did not see her until 7:44 a.m. *Ex*. A, p. 17. The record reflects that she took

Mrs. Leatherbury's vital signs. *Id*. It is disputed that Mrs. Leatherbury reported to the nurse that she "panicked." The record states that Mrs. Leatherbury "reported that she was bleeding heavy with clotting x1hour and became concerned." *Id*.

It is not disputed that on October 5, 2021, Nurse Keltch noted that Mrs. Leatherbury reported that she had used a total of 19 pads since October 1, 2021, that Mrs. Leatherbury reported that she had not drunk much the day before and that Nurse Keltch encouraged her to stay hydrated. *Ex*. A, p. 16. It is disputed that on October 5, 2021, Nurse Keltch provided Mrs. Leatherbury appropriate and timely medical care. According to Dr. Bemenderfer, by October 4, 2021, Mrs. Leatherbury had already lost a significant amount of blood. Dkt. 77-5, p. 2.

It is not disputed that Nurse Keltch offered Mrs. Leatherbury Gatorade; however, it is disputed that Mrs. Leatherbury declined it. *Ex*. A, p. 17. The record reflects that when Nurse Keltch offered the Gatorade, Mrs. Leatherbury stated, "I can't drink orange Gatorade. I do not like the flavor." Nurse Keltch's responded, "I did not know what flavor of Gatorade was available but encouraged her to drink some along with water." *Id*. There is nothing in the record which states that Nurse Keltch ever inquired about the available flavors and offered them to Mrs. Leatherbury. *Id*.

Mrs. Leatherbury remained in the block for five (5) days where the other inmates cared for her because members of Defendant ACH's medical staff would not. *Ex*. F. She was then transferred to a room in the book-in area where she could be observed by corrections and medical staff, who still failed to act on her medical emergency. *Ex*. A, p. 17.

It is not disputed that following her shower, Nurse Keltch took Mrs. Leatherbury's vital signs and called Dr. Hertz's office. *Id*. The Narrative Progress Note also states that Mrs. Leatherbury was taken to the exam room in a wheelchair. *Id*.

Despite Mrs. Leatherbury's and her cellmates' requests, she was not taken to the hospital until October 6, 2021. *Ex.* E, Ex A, p. 18, *Ex*. B. Upon hospital admission Mrs. Leatherbury's hemoglobin level was a dangerous 6.4. *Ex*. C. She was diagnosed with an incomplete abortion and required two units of blood. *Id*.

On October 6, 2021, when Mrs. Leatherbury was admitted to the hospital, the record notes, "pt had Cytotec on Friday after a incomplete abortion. pt began bleeding 45 minutes after. Pt has been bleidng [sic] ever since and passing clots pt is pale." *Ex*. B, p. 59. The hospital record stated that Mrs. Leatherbury had an unsteady gait and was weak and lightheaded when standing due to blood loss. *Id*., p. 65. The hospital record noted that Mrs. Leatherbury's last bowel movement was the day she received the Cytotec on October 1, 2021. *Id.* at p. 65. The Narrative Progress Notes are devoid of any of these observations. *Ex*. A.

Defendant ACH inaccurately noted that Mrs. Leatherbury's hemoglobin was 6.1. Dkt. 78, p. 6. It was in fact 6.4 and she did receive 2 units of blood. *Ex*. C.

It is undisputed that the October 8, 2021, Narrative Progress Note states Mrs. Leatherbury reported to nursing staff that she felt better and had minimal bleeding and no clots. *Ex*. A, p. 20. The notation of that date also recognizes for the first time Mrs. Leatherbury's appearance as "warm, pink and dry." *Id*.

Defendant ACH does not maintain policies and procedures to provide guidance and structure for its nurses, NPs or MDs. *Ex*. G.

**Expert Conclusion of Dr. Kathleen Lynn Bemenderfer**

It is not disputed that Dr. Bemenderfer's report contains the cited language. Dkt. 77-5. For purposes of this case the relevant portion of it is the recognition that Mrs. Leatherbury spent two additional days in jail before being transported to the hospital for treatment. Dkt. 77-5, p. 2.

That two-day delay in effective care resulted in prolonged and unnecessary pain and suffering. *Ex.* H. Any determination that Defendant ACH and its staff met the standard of care is disputed.

**Expert Conclusion of Nurse Linda Bernard**

It is not disputed that Nurse Bernard's report contains the cited language. Dkt. 77-6. It is disputed that the nursing staff's evaluations and nursing care of Mrs. Leatherbury was objectively reasonable. *Ex*. H. It is disputed that it was within the standard of care for the nursing staff to evaluate and monitor Mrs. Leatherbury "as requested." *Ex*. H. It is disputed that Mrs. Leatherbury was sent to the hospital only after she exhibited signs and symptoms that were beyond the ability of the staff at the Jefferson County Jail. *Ex*. H, Dkt. 77-5, p.2. According to Dr. Bemenderfer, Mrs. Leatherbury had lost a significant amount of blood by October 4, 2021, and that if she had been taken to the hospital then, she "still would have required a blood transfusion in the hospital due to blood loss." Dkt. 77-5, p. 2. Thus, objectively, no later than October 4, 2021, Mrs. Leatherbury exhibited signs and symptoms beyond the abilities of Defendant ACH's medical staff at the Jefferson County Jail. *Ex.* A. pp. 13-18. Any determination that Defendant ACH and its staff met the standard of care is disputed.

**Expert Conclusion of Nurse Carol Rogers**

> Based on my review of the available records and my experience in correctional nursing and healthcare administration, it is my opinion, to a reasonable degree of nursing and correctional healthcare certainly, that Ms. Tingle-Duncil experienced predictable and progressively worsening hemorrhagic complications following Misoprostol administration.
>
> Her symptoms - including heavy vaginal bleeding, clot passage, weakness, and pallor represented clear signs of a medical emergency requiring prompt assessment, vital sign monitoring, provider notification, and timely hospital transfer. The failure to conduct timely reassessment and escalate care resulted in severe anemia (hemoglobin 6.4) and the need for a blood transfusion and constitutes a deviation from accepted nursing standards, the Indiana Nurse Practice Act, and community-equivalent correctional healthcare obligations.

> Additionally, the reported lack of required statutory disclosures, documentation, and qualified staffing reflects further non-compliance with Indiana law and standard practice. These deviations increased the foreseeable risk of serious harm, including hemorrhagic shock and life-threatening blood loss. It is more likely than not that earlier nursing intervention and timely emergency referral would have reduced blood loss and prevented progression to severe anemia, and that the adverse outcome was clinically preventable with appropriate, standard-compliant care.

*Ex*. H, p. 4

## IV. STANDARD OF REVIEW

Under both the federal and Indiana systems for summary judgment review, the burden originates with the moving party to prove that there exists no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Fed.R.Civ.P*. 56(c) *and Ind. Trial Rule* 56(C) *respectively; Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)*, Diversified Fin. Sys., Inc. v. Miner,* 713 N.E.2d 293, 297 (Ind. Ct. App. 1999). Material facts are those facts which could affect the outcome of the suit, and a dispute about a material fact is genuine if a reasonable finder of fact could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Once the moving party presents their motion and supporting facts the burden shifts to the non-moving party to present evidence of specific facts showing that a genuine issue exists for trial. *Celotex,* 477 U.S. at 322.

Summary judgment may be inappropriate even when the parties agree on the basic facts but disagree about the inferences that should be drawn from those facts. *Bowyer v. U.S. Dep't of Air Force*, 804 F.2d 428, 430 (7th Cir. 1986). If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *In re Serv. Plastics, Inc*., No. 96 B 09358, 1997 WL 657119, at *7 (Bankr. N.D. Ill. Oct. 20, 1997); see also, *Impossible Elec. Techniques, v. Wackenhut Protective Sys.*, 669 F.2d 1026, 1031 (5th Cir. 1982). "At the summary judgment stage, the judge's function is not himself to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial." *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011) quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate only if the moving party shows that there exists no genuine issue of material fact essential to proving the merits of their case. *Id.* All factual inferences must be construed in favor of the non-moving party, and any doubt as to the existence of a material fact is to be resolved against the moving party. *Shields v. Matrix Absence Mgmt., Inc.*, 06-CV-1314, 2008 WL 4443118 (E.D. Wis. Sept. 24, 2008) amended in part sub nom. *Shields v. Aurora Health Care Long Term Disability Plan*, 06-CV-1314, 2009 WL 2883041 (E.D. Wis. Sept. 4, 2009) citing *Celotex,* 477 U.S. at 331. *Kroger Co. v. Plonski,* 930 N.E.2d 1, 5 (Ind. 2010) citing *Kovach v. Midwest,* 913 N.E.2d 193, 197 (Ind. 2009).

## V. LAW and ARGUMENT

### 42 U.S.C. §1983 Analysis

#### 1. The Fourteenth Amendment "Objectively Unreasonable" Standard

Through a number of cases the Supreme Court has chipped away at the idea that the Eighth Amendment right to be free from cruel and unusual punishment did not apply when considering claims of detainees. *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466, 2475, 192 L.Ed.2d 416 (2015); *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017). Simply put, pretrial detainees are constitutionally presumed innocent and should not be punished at all. *Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018), citing *Kingsley v. Hendrickson*, 135 S.Ct. at 2475. *Kingsley v. Hendrickson* addressed a detainee's claim of Fourteenth Amendment due process right violations by the use of excessive force. *Kingsley,* 135 S.Ct. 2466. In doing so the Court held "that a

pretrial detainee bringing an excessive-force claim did not need to prove that the defendant was substantially aware that the amount of force being used was unreasonable. (Citation omitted.) Rather, the plaintiff needed only to show that the defendant's conduct was objectively unreasonable. (Citation omitted.)" *Miranda* 900 F.3d at 351.

While *Kingsley* only addressed detainees' Fourteenth Amendment due process rights in the context of excessive force, the Supreme Court has long held that incarcerated individuals are entitled to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Pittman ex rel. Hamilton v. Cnty. of Madison*, 746 F.3d 766, 775–76 (7th Cir. 2014). Other circuits extended the *Kingsly* approach to other pretrial detainee Fourteenth Amendment due process claims. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018); *Bruno v. City of Schenectady*, 727 Fed.Appx. 717, 720 (2d Cir. 2018). Historically the Seventh Circuit followed the Eighth Amendment deliberate indifference standard for assessing claims regarding deficient medical care to pre-trial detainees. *Miranda*, 900 F.3d at 350. "The "deliberate indifference' standard requires a showing that the defendant had a 'sufficiently culpable state of mind' and asks whether the official actually believed there was a significant risk of harm." *Miranda*, 900 F.3d at 350, citing *Pittman ex rel. Hamilton v. Cnty. of Madison*, 746 F.3d 766, 775–76 (7th Cir. 2014). Following *Kingsley*, and its expanded application to the provision of healthcare by the Ninth and Second Circuits, the Seventh Circuit held in *Miranda* "that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley.*" *Miranda*, 900 F.3d at 352.

All of this said, a plaintiff seeking to bring a claim under Section 1983 still must establish that he suffered from an objectively serious condition. *Orlowski v. Milwaukee Cty.*, 872 F.3d 417,

423 (7th Cir. 2017). A medical condition is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). "A medical condition need not be life threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id*.

Mrs. Leatherbury's medical condition *was* life threatening. A moderate hemoglobin level is between 8.0 to 10.0 g/dL, a severe hemoglobin level is between 6.5 to 7.9 g/dL, and life-threatening level is less than 6.5 g/dL. *Ex*. J. When Mrs. Leatherbury arrived at the ER her hemoglobin was 6.4 g/dL. *Exs.* C, p.1, H, p. 3. She received two units of packed red blood cells and hemoglobin. At the time of her discharge her status was "acute" as the result of an incomplete abortion and blood loss. *Ex*. C.

Defendant ACH attempts to frame the issue of Mrs. Leatherbury's medical care around her being administered Cytotec. Dkt. 78, p.1. It does not. The claim is not that she was given the drug. The claim is that Defendant ACH failed to provide her with timely and appropriate medical care after she received it. This argument is supported by Mrs. Leatherbury's expert, Carol Rogers, BSN, RN, CCHP. She stated:

> Patients receiving Misoprostol for missed abortion require:
>
> - Baseline and follow-up vital signs.
> - Bleeding quantification and symptom monitoring.
> - Clear thresholds for urgent medical evaluation.
> - Prompt ER referral if hemorrhage exceeds expected norms

The Narrative Progress Notes are devoid of any consideration of these requirements. *Ex*. A. There is no documentation of baseline and follow-up vital signs. There is no bleeding quantification or symptom monitoring. There are no outlined thresholds for urgent medical

evaluation, and there was no prompt referral, because, according to Dr. Bemenderfer, Mrs. Leatherbury remained in jail for over 48 hours after she had lost a significant amount of blood. Dkt. 77-5, p. 2.

Nurse Rogers concluded that:

> Based on my review of the available records and my experience in correctional nursing and healthcare administration, it is my opinion, to a reasonable degree of nursing and correctional healthcare certainly, that Ms. Tingle-Duncil experienced predictable and progressively worsening hemorrhagic complications following Misoprostol administration.
>
> Her symptoms - including heavy vaginal bleeding, clot passage, weakness, and pallor represented clear signs of a medical emergency requiring prompt assessment, vital sign monitoring, provider notification, and timely hospital transfer. The failure to conduct timely reassessment and escalate care resulted in severe anemia (hemoglobin 6.4) and the need for a blood transfusion and constitutes a deviation from accepted nursing standards, the Indiana Nurse Practice Act, and community-equivalent correctional healthcare obligations.
>
> *Ex.* H, p. 4

Dr. Bemenderfer, would have to agree with the conclusion that Mrs. Leatherbury's medical care was delayed because she determined that:

> By the time the patient saw an officer in the late evening/early morning of October 4, 2021, she had already lost a significant amount of blood. So even if the *jail* staff had sent her to the hospital at that time, or the following day on October 5, 2021, [Mrs. Leatherbury] would have required a blood transfusion in the hospital due to blood loss. Emphasis added.
>
> Dkt. 77-5, p. 2.

For Mrs. Leatherbury to prevail she does not need to prove that she received no medical treatment. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). She just needs to establish that there was a significant delay in effective care which resulted in prolonged and unnecessary pain. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). Mrs. Leatherbury and the other women in the pod requested medical assistance for five days before she was even removed for

observation and another day before she was finally taken to the hospital. *Exs*. E, F. During that time, Mrs. Leatherbury lost a life-threatening amount of blood. *Ex.* B, C, E, F, H, J, Dkt. 77-5, p.2.

According to the Narrative Progress Notes, Defendant ACH's staff checked on Mrs. Leatherbury on October 2nd, 3rd, 5th, and 6th. *Ex*. A, pp. 11, 17-18. The notes have no record of the medical staff checking on Mrs. Leatherbury on October 4th. *Ex*. A, p. 13. Dr. Bemenderfer's assessment was that Mrs. Leatherbury had lost a considerable amount of volume before she requested the protocol on October 4th. Dkt. 77-5, p. 2. The officer who performed the protocol was so concerned by her condition that he reached out to Defendant ACH's employee NP Washington who simply said to have her placed on a medical watch and the nurse would follow up in the morning on October 5th. *Ex*. A, p. 16. Dr. Bemenderfer recognized, just by reading the record, that Mrs. Leatherbury had lost a significant amount of blood by the time Defendant ACH's medical staff saw her on October 5th and yet despite her clearly apparent emergent medical condition, Mrs. Leatherbury was not taken to the hospital until October 6th. *Ex*. A, p. 18, *Ex*. B.

When Mrs. Leatherbury arrived at the hospital, the medical records show she had a life-threatening hemoglobin level of 6.4. *Ex.* C. She was diagnosed with vaginal bleeding, severe anemia and spontaneous abortion. *Id*. She received two units of packed red blood cells and remained in the hospital overnight for observation. *Id*.

**2. Defendant ACH wrongly contends that its policies, practices, and procedures, or absence thereof, were not the moving force behind the alleged Constitutional violations.**

**The Single-Incident Exception**

Mrs. Leatherbury's 42 U.S.C. §1983 claims against Defendant ACH stem from its failure to have in place policies and procedures for the direction and guidance of its employees and to

train its staff. Dkt. 1, p. 12, ¶61. Defendant ACH argues that, because it was acting under color of law, it should be treated as a municipality for purposes of Section 1983. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766, n. 6 (7th Cir. 2002). That point is not disputed. According to Defendant ACH's counsel, "ACH does not maintain policies and procedures" but rather the staff is left to its own devices. *Ex*. G. Mrs. Leatherbury argues that it was Defendant ACH's lack of policies, practices, and procedures was the moving force behind the Constitutional violations she sustained.

A municipality may be liable under *Monell* where: (1) the plaintiff was deprived of a federal right; (2) the deprivation of that right is "properly attributable to the municipality itself" in that some municipal action (*i.e*., a policy or custom) caused the deprivation; (3) the policy or custom demonstrates municipal fault (i.e. deliberate indifference); and (4) there is a "direct causal link" between the challenged municipal action and the violation of the plaintiff's constitutional rights (i.e. the municipal action was the "moving force" behind the violation). *Dean v. Wexford Health Sources, Inc*., 18 F.4th 214, 235 (7th Cir. 2021). "A municipality can be held liable, even when its officers are not, unless such a finding would create an inconsistent verdict." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010).

> "[T]o prevail on a § 1983 claim against a municipality under Monell, a plaintiff must challenge conduct that is properly attributable to the municipality itself." *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). Where the municipality has not directly violated the plaintiff's rights and instead caused an employee to do so, the plaintiff must demonstrate that the municipality acted with deliberate indifference to the plaintiff's constitutional rights. *Id*. at 987. Additionally, the plaintiff must prove that the municipality's action was the "moving force" behind the plaintiff's violation. *Id*.
>
> *Giese v. City of Kankakee*, 71 F.4th 582, 588 (7th Cir. 2023)

"The second path to *Monell* liability runs not through an expressly unconstitutional policy, but instead through 'gaps in express policies' or through 'widespread practices that are

not tethered to a particular written policy'—situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022), quoting *Calhoun v. Ramsey*, 408 F.3d 375, 80 (7th Cir. 2005).

The Seventh Circuit recognizes a single-incident theory of liability under which a risk of constitutional violations may be so high and the need for training so obvious that a municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation. *Giese v. City of Kankakee*, 71 F.4th 582 (2023).

Adequate medical care is a federal right of incarcerated individuals. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Pittman ex rel. Hamilton v. Cnty. of Madison*, 746 F.3d 766, 775–76 (7th Cir. 2014). A significant delay in medical treatment may support a claim of deliberate indifference, "especially where the result is prolonged and unnecessary pain." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Mrs. Leatherbury argues that the moving force behind the delay in her medical care, and subsequent injuries, is properly attributable to Defendant ACH's failure to have in place policies and procedures to guide and train its medical staff. This argument is supported by Nurse Rogers who concluded that:

> Her symptoms - including heavy vaginal bleeding, clot passage, weakness, and pallor represented clear signs of a medical emergency requiring prompt assessment, vital sign monitoring, provider notification, and timely hospital transfer. The failure to conduct timely reassessment and escalate care resulted in severe anemia (hemoglobin 6.4) and the need for a blood transfusion and constitutes a deviation from accepted nursing standards, the Indiana Nurse Practice Act, and community-equivalent correctional healthcare obligations.
>
> *Ex.* H, p. 4

It is also supported by Dr. Bemenderfer, who concluded that:

> By the time the patient saw an officer in the late evening/early morning of October 4, 2021, she had already lost a significant amount of blood. So even if the *jail* staff had sent her to the hospital at that time, or the following day on October 5, 2021, [Mrs. Leatherbury] would have required a blood transfusion in the hospital due to blood loss. Emphasis added.
>
> Dkt. 77-5, p. 2
>
> The alternative path to *Monell* liability comes from a door the Supreme Court opened in *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Court observed that there may, as here, be circumstances in which "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights" that a factfinder could find deliberate indifference to the need for training. *Id*. at 390, 109 S.Ct. 1197. "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id*. Put another way, a risk of constitutional violations can be so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation.
>
> *J.K.J. v. Polk Cnty*., 960 F.3d 367, 380 (7th Cir. 2020)

Defendant ACH's failure to have *any* policies and procedures in place to direct its medical staff, specifically as here involving the significant loss of blood due to a gynecological or obstetric emergency, abdicates its responsibility to the patients they are hired to provide services. Also, failing to train and give guidance to its staff places an undue burden on staff who are responsible for the health, safety and medical care of, in some instances, hundreds of patients.

Defendant ACH posts on its website that it provides:

> Healthcare
>
> Professional clinical services in correctional settings through a structured, compliant, and outcomes-focused delivery model, supporting correctional agencies, governmental entities, and partner organizations by delivering

healthcare services aligned with applicable laws, standards, and contractual requirements.

*Ex.* I

Defendant ACH touts that it services 22,000 patients in over 256 facilities in 18 states nationwide. *Ex*. I. Defendant ACH holds itself out to provide services through a "structured, compliant, and outcomes-focused delivery model"; and yet, Defendant ACH acknowledges that it does not maintain policies and procedures as to its nurses, NPs or MDs. *Ex*. G. Using the words from Defendant ACH's website, it has no structure (policies or procedures) to provide compliant healthcare. A "focused delivery model" necessitates policies and procedures that includes guidance and training to define and implement the model.

A considerable number of Defendant ACH's thousands of patients are female. There are specific gynecological and obstetric services that Defendant ACH's medical staff must be competent to provide. *Ex*. H, p. 4. Using the *J.K.J. v. Polk Cnty* analysis, Defendant ACH's failure to have policies and procedures in place to establish a "structured, compliant, and outcomes-focused delivery model" created a risk of constitutional violations so high and the need for training so obvious that Defendant ACH's failure to act was deliberate indifferent creating an inference of institutional culpability, even in the absence of a similar prior constitutional violation. This deliberate indifference was to Mrs. Leatherbury's medical needs and the overall medical needs of female inmates in the Jefferson County Jail and in the other 255 facilities Defendant ACH serves.

Following Mrs. Leatherbury's medical emergency, nearly five (5) years ago and after receiving Dr. Bemenderfer report noting evident blood loss and delayed care, Defendant ACH still has not implemented policies and procedures to ensure a "structured, compliant, and outcomes-focused delivery model." This failure to act further evidences Defendant ACH's

deliberate indifference to the healthcare needs Mrs. Leatherberry experienced, and the past, current and future medical needs of the female inmate population in the Jefferson County Jail and in the other facility where it provides services. *Ex.* I. This knowing acquiescence is precisely that which was contemplated by *Taylor* and *Calhoun*.

Defendant ACH has made a conscious decision not to have *any* policies or procedures that provide guidance and training to its staff to help assess, treat, and ultimately, if necessary, refer the patient to the hospital for further care, and particularly relevant here, in situations involving the significant loss of blood due to a gynecological or obstetric emergency. Defendant ACH's conscious choice not to have policies and procedures in place is the *policy* and *custom* that directly and proximately caused the violation of Mrs. Leatherbury's civil rights. This conclusion is consistent with the holding in the *City of Canton*, and as such, Defendant ACH's Motion for Summary Judgment regarding its 42 U.S.C. §1983 violations should be dismissed.

**B. State Law Causes of Action**

Defendant ACH's Motion for Summary Judgment focuses solely on allegations of I.C. 16-34 and the obligations and responsibilities of healthcare providers flowing from it. Defendant ACH did not address Mrs. Leatherbury's Causes of Action V and VI for its negligence and that of its staff for failing to provide adequate and timely medical care. Dkt. 1.

The Seventh Circuit has expressly acknowledged that respondeat superior liability exists in Indiana tort law, and that its existence is sufficient to preclude summary judgment on a negligence claim against a jail medical provider. *Perkins v. Lawson*, 312 F.3d 872, 876 (2002). "'Furthermore, in Indiana, summary judgment is generally seen to be inappropriate in negligence actions." *Barsz v. Max Shapiro, Inc.*, 600 N.E.2d 151 (Ind.App.1992).'" *Id*. Mrs. Leatherbury

disputes any contention by Defendants that she was provided timely and appropriate medical care for her hemorrhage. *Ex.* E.

Nurse Rogers found six areas where Defendant ACH and its staff failed to meet the accepted standard of care. *Ex*. H.

The first deficiencies arose under the Indiana Nurse Practice Act, Indiana Code Title 25, Article 23. Nurse Rogers addressed that the Indiana Nurse Practice Act requires nurses to:

- Perform timely assessments.
- Monitor changes in patient condition.
- Recognize and respond to emergent or life-threatening symptoms.
- Advocate for escalation of care when deterioration is evident.
- Practice within evidence-based clinical standards.

She noted that the "omissions represent a departure from Indiana nursing legal standards and failure to exercise reasonable nursing judgment. *Id*. Care fell below community obstetric safety standards, placing the patient at avoidable medical risk." *Id*. Particularly, Defendant ACH did not lay eyes on Mrs. Leatherbury on October 4, 2021. *Ex*. A, p. 13. If they had, they would have noted what Dr. Bemenderfer concluded, which was that Mrs. Leatherbury had lost a significant amount of blood before the protocol was conducted on October 4th. Dkt. 77-5, p. 2. Then again on October 5th, based upon both Nurse Rogers' and Dr. Bemenderfer's assessments, Defendant ACH's staff should have recognized and responded to the emergent or life-threatening symptoms. Exs. A, H, Dkt. 77-5, p. 2. NP Washington failed to escalate care when heavy bleeding and tachycardia developed. Exs. A, H. Nurse Rogers noted that Defendant ACH allowing custody officers to conduct medical protocols *in lieu* of nursing staff violates the Indiana Nurse Practice Act. *Ex*. H, p. 4. Finally, Defendant ACH's staff delayed emergency transfer despite clear indications of hypotension, tachycardia, clot burden, and syncopal risk causing Mrs. Leatherbury's condition to continue to deteriorate. *Id*.

A second area of deficiency arose from the Indiana Community Standards for Obstetric and Miscarriage Care. Nurse Rogers reported that care provided to patients receiving Misoprostol for a missed abortion require:

- Baseline and follow-up vital signs.
- Bleeding quantification and symptom monitoring.
- Clear thresholds for urgent medical evaluation.
- Prompt ER referral if hemorrhage exceeds expected norms

Mrs. Leatherbury bled for six (6) days before she was finally taken to the hospital where her hemoglobin was determined to be 6.4 and she did receive 2 units of blood. *Ex.* C. Despite Mrs. Leatherbury, and the ladies in her dorm, reporting that she was soaking pads hourly, passing large clots, and was having prolonged heavy bleeding, the Narrative Progress Notes completed by Defendant ACH's staff are devoid of any record of the quantity of discharge. *Ex*. A. Objective indicators of hemodynamic compromise (BP 97/67, HR 113) were present before ER transfer. *Exs*. H, A. Emergency referral occurred only after clinical deterioration became severe. *Id*.

The third area of violation arose from Defendant ACH's staff failing to meet minimum NCCHC 2018 Jail Health Standards. The National Commission on Correctional Health Care (NCCHC) 2018 sets standards for health services in jails and establishes the baseline for constitutionally acceptable medical and mental health care in correctional facilities. "The identified failures represent departures from basic clinical assessment, triage, and emergency response requirements and created a foreseeable and preventable risk of serious harm." *Ex.* H, p. 4.

Nurse Rogers determined that Defendant ACH's staff failed to meet these requirements by:

- Delayed medical response to a known high-risk obstetric complication.

- Failure to maintain ongoing clinical monitoring.
- Inappropriate reliance on custody officers to conduct medical checks.
- Failure to ensure urgent physician or hospital referral.
- Insufficient documentation of bleeding volume, assessment findings, and nursing decision-making.

Once again, Defendant ACH's failure to have any policies and procedures in place, in this instance related to monitoring, reliance on custody officers, referrals and documentation coupled with an apparent lack of training as it relates to high-risk obstetric complications resulted in its staff being inadequately equipped to handle Mrs. Leatherbury's medical emergency.

Nurse Rogers also concluded that Defendant ACH failed to meet the legal requirements for healthcare in Indiana jails. She noted that Indiana jail healthcare systems must ensure:

- Timely access to qualified medical staff.
- Emergency medical protocols are managed by licensed clinicians.
- Protection of medically vulnerable populations, including pregnant inmates.
- Compliance with Indiana State Law.

Following her review of the records she noted that the custody officers reported no training for medical emergencies. *Exs.* H, p. 5, A, p. 16. The Narrative Progress Notes documented that there was no immediate medical housing placement despite Mrs. Leatherbury's clear hemorrhage risk. *Ex*. A, p. 16. The records provided no evidence of urgent escalation. *Ex*. A. According to Dr. Bemenderfer, Mrs. Leatherbury lost a significant amount of blood between October 1, 2021, when the medication was provided, and October 4, 2021, when the protocol was performed. There is no evidence that there was an urgent escalation even after corrections officers performed the protocol on October 4, 2021, and contacted NP Washington with their concerns. *Ex*. A, p. 16. Even after that notice Mrs. Leatherbury remained in jail for over 48 additional hours, before she was transported to the hospital on October 6, 2021, during which time her condition continued to deteriorate. *Exs*. A, p. 18, C.

Again, Defendant ACH's failure to have policies and procedures to address the need to urgently escalate a case when bleeding persisted for multiple days was a direct and proximate cause of its staff's negligence in handling Mrs. Leatherbury's medical emergency.

Defendant ACH's staff's negligence led to critical practice failures. Nurse Rogers found that there was no baseline assessment prior to Cytotec administration. *Ex.* H, p. 5. The October 1, 2021, Narrative Progress Note does not evidence any assessment of Mrs. Leatherbury's vital signs. *Ex*. A, p. 11. The record does not reflect any scheduled post-medication reassessments or monitoring of Mrs. Leatherbury's hemorrhaging and hypovolemia. *Ex*. A. A deficiency that has carried through in all of the Nurse Rogers's findings was the delayed emergency referral despite Mrs. Leatherbury exhibiting clear clinical red flags that she was experiencing a medical emergency. *Ex*. H. Nurse Rogers noted that Defendant ACH's staff was negligent when it failed to protect Mrs. Leatherbury's safety during a shower despite there being a syncope risk. *Ex*. H.

Finally, Nurse Rogers noted multiple violations of the Jefferson County Jail Medical Care Policy. *Ex*. H, p. 5. As before, there was a failure to timely identify Mrs. Leatherbury's urgent medical needs and to have an immediate medical response and intervention. *Id*. There was a failure of ongoing clinical monitoring and to appropriately escalate the care with an emergency referral when the situation clearly called for them to do so. *Id*. Defendant ACH's staff's negligence resulted in Mrs. Leatherbury receiving delayed emergency medical care resulting in her experiencing prolonged pain and suffering.

Mrs. Leatherbury acknowledges that the definition of abortion, as defined in Ind. Code Ann. § 16-18-2-1 and the obligations and responsibilities of healthcare providers flowing from it do not apply to the removal of a dead fetus. As such, she does not oppose dismissal of any state claim she argues related to Ind. Code Ann. § 16-34-3, 23-14-54, 16-34-2-1.1 or 410 IAC 39-6-2.

**CONCLUSION**

As noted above, there is little dispute over the basic facts of this case. As *Bowyer* stated, the parties can agree on the facts and summary judgment might still not be appropriate. *Bowyer,* 804 F.2d 428, 430. That is because reasonable minds can differ on the inferences taken from the undisputed facts. *In re Serv. Plastics, Inc*., No. 96 B 09358, 1997 WL 657119, at *7. That is what we have in this case. As such, for the reasons set out above, Mrs. Leatherbury prays this Court deny Defendant ACH's *Motion for Summary Judgment* and allow this matter to proceed to trial.

RESPECTFULLY SUBMITTED:

Date: July 29, 2026

*/s/ J. Clayton Culotta*
James Clayton Culotta
Bar No. 26733-11
815 E. Market Street
New Albany, IN 47150
Telephone No. (812) 913-6988
Facsimile No. (812) 941-8883
clay@culottalaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of July 2026, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record:

*/s/ J. Clayton Culotta*
J. Clayton Culotta